## GOOCH-EDENTON HARDWARE CO. v. LONG et al.—69 E. W. (2d) 254.

Western Section.   November 25, 1933.

Petition for Certiorari denied by Supreme Court, February 24, 1934.

S. J. Everett, of Jackson, for appellant.
Pigford & Key, of Jackson, for appellees.

SENTER, J. This is an appeal from the decree in favor of the defendants and against the complainant by the Honorable V. H. Holmes, chancellor, sitting by interchange with the Honorable De-Witt T. Henderson, regular chancellor of the chancery court of Madison county, Tennessee.

The bill alleges, in substance, that the complainant for a long number of years had been the tenant of the defendants Ezell Long and Mrs. Wilbon Long Palmer, the owners of the leased storehouse occupied by complainant in the city of Jackson; that the building was wired for lighting with electricity, and that the electric wiring was improperly installed, and had become worn and defective and dangerous; that complainant notified the defendants of the dangerous condition of the wiring and called upon defendant many times to have the building properly and safely wired for electric lighting, and that defendants failed, neglected, and refused to comply with the request. It is alleged by complainant that it was carrying a large stock of merchandise, and that the defective wiring, in its worn and defective condition, was dangerous and constituted a serious menace and fire hazard. It is alleged that, upon the failure and refusal and the neglect of the defendants to properly repair the electric wiring in the building or to install a safe wiring system, complainant contracted with an electrician to furnish the materials and to rewire the building for electric lights, and to make the same safe and efficient, and paid the bill, amounting to the sum of $630.04. It is further alleged that the elevator used in the building got out of repair, necessitating a new elevator rope, which complainant purchased and which was necessary to make the elevator usable, and that subsequently the elevator was damaged by a fire which broke out in the building, and that this necessitated buying another elevator rope or cable, which complainant paid for, and that the two ropes so purchased and in-

stalled by complainant amounted to the sum of $68.60, and the defendant refused to pay the entire bill· for the elevator repairs, but did pay the sum of $33, leaving a balance due and owing to complainant on account of the elevator repairs of $35.60. The bill sought to recover of the defendants the cost of rewiring the building and the $35.60 repair for the elevator and the interest thereon to the date of the filing of the suit. There was a demurrer to the bill by the defendant. The principal ground of the demurrer being that there was no allegation in the bill that, under the lease contract between the parties, and under which complainant was occupying the building, there was any duty or obligation upon the part of the defendant to make the repairs of the kind and character made by complainant, and for which complainant sought reimbursement; that there was no allegation in the bill that the defendants or either of them were under any legal obligation to make the repairs to the electric wiring, or that the defendants or either of them authorized said repairs to be made. Upon the filing of the demurrer and before a hearing upon the demurrer, the complainant was permitted to amend the bill in certain particulars, and, upon the amendment being allowed, the chancellor overruled the demurrer, but with permission to the defendants to rely upon the grounds thereof in their answer.

Whereupon, defendants answered the bill, and by the answer admitted that complainant was engaged in the mercantile business in Jackson, and occupied the building owned by defendant in conducting its mercantile business, and that complainant was the tenant of defendants at a monthly rental for the store building in question. The answer admits that the building had been wired for lighting with electricity, but denied that the wiring was improperly installed, and that it had become old, worn, defective, and dangerous, but averred, however, that, if the wiring was worn and defective, defendants were under no contractual or legal obligation to repair the same, or that it was their duty under the lease contract to have any other or different wiring installed in the building. The answer denied that defendants were liable for the expenditures made by complainant for rewiring the building, and denied that they were under any legal duty or obligation to complainant to keep said building in safe condition and not to expose the building and complainant's stock of merchandise to the hazards of fire by allowing or permitting improperly installed, worn, or defective electric wiring or appliances to remain in the building as alleged by complainant. The answer averred that the complainant was occupying said building under and by virtue of a lease contract which was in writing, and which written contract fixed the respective rights and liabilities of the respective parties, and that under said written contract there was no obligation or duty devolving upon the defendants to keep the wiring or other parts of the building in repair, as is alleged by the bill as amended. The

answer further denies any liability for the item of $35.60 for repairs to the elevator, and sued for by the complainant.

Considerable evidence was taken by the respective parties on the issues presented by the pleadings. At the hearing of the cause the chancellor held and so decreed that complainant was not entitled to any of the relief sought, and dismissed the bill at the cost of complainant. From this decree complainant has appealed to this court and has assigned errors. There is contained in the record a finding of the facts as found by the chancellor. The several assignments of error filed are directed to the several propositions of fact as found by the chancellor, which finding of facts is as follows:

"1. The lease contract which is in writing does not obligate the lessors to make repairs, except in event of damage by fire, wind, or flood, etc.

"2. The condition of the electric wiring was bad, and known to be so by complainant, before acceptance of the lease.

"3. Complainant had the building rewired, and paid for the rewiring the amount set out in the bill.

"4. This amount appears to be unreasonable, the work should have been done for one-half of the amount.

"5. After the work was done, Long did promise to pay some part of the cost thereof, what portion does not appear.

"6. It is not shown, by a preponderance of proof that Long agreed to pay for any part of the work, before the work was done."

It appears that complainant for a number of years had occupied the building owned by defendants, and in which building complainant conducted a hardware mercantile business. In 1927 a new lease contract between complainant and the defendants was entered into. The contract was dated July 1, 1927, and was for a term of five years, at an annual rental of $4,200, to be payable monthly on the first day of each month. The pertinent portions of the contract to be considered in the determination of the questions presented by the pleadings and on this appeal are as follows:

"And the party of the second part hereby covenants to and with the party of the first part to make punctual payment of the rent, in the manner aforesaid, and quit and surrender the premises at the expiration of said term, or other determination of this lease, in as good condition and state as reasonable use and wear thereof will permit, damage by the elements excepted; and furthermore covenants that he, the party of the second part, will not use or occupy said premises for any business or purposes deemed extra hazardous, on account of fire. . . .

"Said party of the second part covenants and agrees to keep said premises in good order, and in the condition that same are now, except the ordinary wear and tear, fire and elements excepted, and to pay all water rates and plumbing repairs, and to prevent the attach-

ing of bills or painting or other advertising matter to or on the wall of said building.

"And it is further agreed that in case the said building on said premises shall without any fault or neglect on the part of the party of the second part, be destroyed or so injured by the elements as to be untenable and unfit for occupancy, the same is to be repaired by the party of the first part as soon thereafter as possible, and the party of the second part shall not be liable or bound to pay rent after the time of such destruction or injury, until repairs have been made, but upon being repaired or rebuilt, the party of the second part agrees and contracts to reoccupy and continue therein until the full term of five years shall have expired, and to pay rent as if said accident had not occurred; provided, always, no rent is to be paid for the period of time said building is destroyed or remains untenable and unfit for occupation.

"The party of the second part agrees and covenants to make no material alterations in said building without the written consent of the party of the first part."

It appears that in the late fall of 1928 complainant procured Mc-Millan Electric Company to make a survey of the wiring in the building with the view of either repairing or rewiring the building, and proceeded to let the contract to McMillan Electric Company for the installation of an entirely new conduit electric wiring system for the building, and, upon a completion of the installation of the new electric wiring system, McMillan Electric Company rendered its bill for materials furnished and labor aggregating the sum of $630.04. It appears that the defendants were not consulted about the incurring of this expense. It does appear that some time prior thereto, and before the last lease contract was entered into between the parties, complainant had complained to the defendants that the electric wiring was not in good repair and was dangerous, and had requested defendants to make the necessary repairs to the electric wiring, but it does not appear that defendant agreed to do the wiring, or to pay any part of the expense thereof, prior to the new lease contract of July 1, 1927. After the new conduit system of wiring had been installed, and after complainant had paid the cost thereof of $630.04 to Mc-Millan Electric Company, Mr. Edenton called the attention of Mr. Ezell Long, one of the defendants, to the bill and requested reimbursement. On this subject Mr. Edenton testified as follows:

"Q. After the work was done, and you had paid Mr. McMillan the $630.04, did you again call it to the attention of Mr. Long. A. Yes.

"Q. And asked him to pay the same? A. Yes.

"Q. What did Mr. Long say when you presented the account to him? A. He said he would not pay so large an amount, but would pay the greater part of it, not stating the exact amount that he

would pay. He further stated he would begin making the payment within sixty days, and pay a certain pro rata per month thereafter.

"Q. Did Mr. Long ever pay any part of this wiring bill, that was contracted by you to McMillan? A. Not one penny.

"Q. Did he ever promise to make payments on it more than once? A. Yes, several times.

"Q. Did he ever finally refuse to make any payments at all? A. Yes."

On cross examination, Mr. Edenton testified that his firm began occupying the building under a lease contract with former owner in 1908, and had occupied the building continuously since that time under lease contracts with different owners, and until the property was acquired by W. H. Long, the father of defendant, and that after the death of W. H. Long his firm continued to occupy the building under lease contracts with the defendants, and the new contract was entered into between the parties on July 1, 1927, which was a contract signed after the expiration of the former lease with W. H. Long. On cross-examination he was asked and answered as follows:

"Q. How long after the execution of the lease of July 1, 1927, was it before you notified Ezell Long that the wiring was defective, and was the notification in writing or verbal? A. He had been notified previously to that time. He had also been notified personally and in writing.

"Q. What was the date of your first notification to Mr. Long of this defective wiring? A. At least two years before the repair work was done."

██ It thus appears that Mr. Edenton had full knowledge of any defective condition of the wiring prior to the signing of the lease of July 1, 1927. According to his evidence, the notice which he gave to Ezell Long that the wiring was defective, and that, if Long did not repair it, his firm would at the expense of Long, was at least two years before the wiring was installed, which was at least about one year before the lease of July 1, 1927, was signed. No witness for complainant testified that Ezell Long, or either of the defendants, ever promised or agreed to rewire the building or to repair the old wiring at any time prior to the letting of the contract by complainant to the McMillan Electric Company. The complainant admittedly knew of the defective condition of the wiring, and that it was old and worn at the time the new lease was signed, and with this knowledge, and although Mr. Edenton claimed that he had previously requested Ezell Long to make the repairs to the wiring, when he came to enter into the new lease at the expiration of the old, he did not make any provision in the lease contract with reference to the wiring, but did agree to keep the building in as good repair and in as good condition as it was in at the time of the execution of the lease contract, usual wear from use excepted.

As early as the case of Banks et al. v. White, 1 Sneed (33 Tenn.), 613. it was held:

"No warranty results by implication of law, as to the continuing condition of property demissed by lease. The only implied warranty is as to title, and any acts by or under the landlord, which could affect the use of the property. Against every other event or contingency the lessee must provide by express stipulation, in order to exonerate himself from the payment of the rent."

The above accords with the general rule, to the effect that there is no obligation on the part of the landlord to repair, or to keep in repair, a leased building in the absence of an express covenant. 16 R. C. L., pp. 1030-1033, secs. 552, 553. The rule as thus announced in Ruling Case Law is supported by a long list of authorities. To the same effect is Olmstead v. Tennessee Fixture & Showcase Co., 1 Tenn. Ch. App., 653, and Louden v. Cline, 8 Tenn. Civ. App. (8 Higgins), 272.

We are also of the opinion that, where a lessee takes the property under a lease contract, knowing of defects, and without a covenant in the lease contract to repair by the lessor, the lessee enters at his own risk. Boyd v. McCarty, 142 Tenn., 670, 222 S. W., 528.

We are therefore of the opinion that the learned chancellor correctly held that the defendants were not under any legal or contractual obligation to make the repairs to the wiring in the building under the facts as disclosed by the record and under the terms of the lease contract.

Another significant fact disclosed by the record is that, after complainant had paid the bill for the electric wiring, it continued to make the regular monthly rental payments to the defendants, and did not at any time seek to apply the monthly rentals, or any part thereof, to this account for wiring. On November 21, 1932, the complainant rendered a bill to the defendants covering the $630.04 wiring item, a balance of $35.60 on elevator repair, and $113.40 interest, aggregating $779.04. During all the time from the installation of the new wiring system, which was completed in December, 1928, and paid for upon its completion, complainant continued to pay the regular monthly rental for the leased premises without making any deduction, and rendered its bill on November 21, 1932, covering the items now sued for.

We also fully concur in the conclusion reached by the chancellor that the cost of installing the new conduit wiring system was grossly exorbitant. It would appear that complainant, in contracting for this expense, was utterly indifferent as to the cost. However, in view of the conclusion we have reached as above set forth, we do not think it at all material.

Appellant, both in argument at the bar of this court and in the brief filed in support of the assignments of error, earnestly

contends that, because the defendants, through the defendant Ezell Long, promised to pay a part of the cost of wiring, they are liable to complainant on account of said promise, and on a quantum meruit basis, if not liable for the entire bill. There is no contention made that the defendants or either of them ever promised or agreed to pay any part of the electric wiring bill prior to its installation. If the defendants were under no legal or contractual obligation to pay any part of this expense, any promise made by Ezell Long, after the expense had been incurred would be without consideration, and unenforceable. It is the contention of appellant on this question that there was a consideration. This contention is based upon the fact that the rewiring of this building enhanced the value of the building; that the old system was obsolete in type of construction, and referred to as the tube and knob system, while the system installed was the conduit, a much safer, better, and more durable type of wiring, and also reduced the hazard of fire. This contention would reflect merit if the promise to pay a part of the expense had been made before the wiring contract had been let and installed, on the theory that, for the mutual benefit that would accrue to the parties, it would in effect constitute an addenda or a new contract pertaining to that improvement. However, it is admitted that any promise to pay any part of this bill by the defendants, or either of them, was after the expense had been incurred.

In the recent case of Winer v. Williams, 165 Tenn., 190, 54 S. W. (2d), 723, it was held that a mere verbal agreement by a landlord during the term of the lease to accept a reduced rent is without consideration and unenforceable. In that case the complainant landlord sued to recover an alleged balance due for rent on leased premises. The defense was that the landlord, while the lease was in force, had agreed, verbally, to reduce the monthly rental from $125 per month to $100 per month, and that the defendant had paid the $100 per month as per the agreement to reduce, and hence was not liable for the additional $25 per month sued for by the landlord. The landlord denied that he had made such an agreement. The court in that case predicated its holding solely on the ground that, even if such promise to reduce the rent had been made by the landlord, such promise was void and without consideration, and, hence, unenforceable, and this holding is set out in the second headnote:

"A mere verbal agreement by a landlord during the term of a lease to accept a reduced rent is without consideration and unenforceable; so that, upon the expiration of the term the landlord may recover from the tenant the difference between the rent stipulated for by the lease and the reduced rent which had been paid."

In support of the holding, the court in that case cites the rule in 36 C. J., 345, 346, under the title "Landlord and Tenant."

We are of the opinion that this contention made by appellant cannot be sustained.

■ There remains to be considered the item of $35.60 alleged balance due for the elevator rope. It is admitted that the defendants paid for the elevator rope that was destroyed in the fire. The other rope was a mere repair, and under the contract it was the duty of complainant to keep the elevator in repair.

It results that we find no error in the decree of the chancellor, or in the finding of the facts by the chancellor, and all assignments of error are overruled, and the decree is affirmed.

Appellant and surety on the appeal bond will pay the cost of this appeal.

Anderson and Ketchum, JJ., concur.